## ILLINOIS BANKERS' LIFE ASS'N v. HARDY.

No. 20472. Opinion Filed Nov. 10, 1931.

Everest, Dudley & Brewer (by John H. Halley), for plaintiff in error.

H. W. Sitton, for defendant in error.

KORNEGAY, J. This is a proceeding in error to review a judgment in favor of the defendant in error in the sum of $2,000, entered on an insurance policy issued by the plaintiff in error. The pleadings in the case show that the present defendant in error instituted an action against the plaintiff in error, the charging part of which is as follows:

"II. That on the 15th day of December, 1924, at Duncan, Okla., the defendant in consideration of the payment by one Charley Edwin Hardy to it, of $34.20, made its policy of insurance in writing, of which a copy is hereto annexed, marked exhibit 'A' and made a part of this petition, and thereby insured the life of the said Charley Edwin Hardy in the sum of $2,000, in favor of this plaintiff, and which insurance policy provided, under the provisions thereof, that in the event of the death of said insured by accidental cause, that it would pay to the beneficiary under said policy the sum of $4,000."

It further charges that on the 19th of April, 1926, the insured was killed while working on an oil and gas drilling rig near the town of Wewoka, and on the 22nd of September, 1926, the plaintiff furnished the defendant with proof of death of the insured. It further averred that all conditions in the policy were complied with by the plaintiff and by the insured. That demand had been made on the defendant to pay $4,000 and there was $4,000 now due. The petition was verified on the 13th of December, 1926, and filed the same day.

The answer of the defendant was filed on the 10th of May, 1927, and it was duly verified. It was a general denial and admission of having executed a policy in favor of the decedent under date of December 15, 1924, but averring that the yearly premium due after December 15, 1925, had never been paid, and averred that the policy lapsed. There was a prayer for the recovery of costs.

A reply was made which is a general de-

nial with the exception of the allegation as to issuing the policy. The matters came on for hearing and objection was made to the introduction of proof under the petition, and it was overruled. The witness testifying was Mrs. Hardy, the wife of Paul Hardy, brother of the insured, and the proof was that the cause of his death was a board falling on him while he was working on a derrick. A copy of the policy was set out and marked "Plaintiff's Exhibit A."

The witness was asked about reading the correspondence between the company and the insured, and was also asked whether the policy was reinstated, but the court refused to let the last part be answered, stating that it was a matter for the jury and the court. She was examined in a very leading and suggestive manner, and a letter from the insurance company to Charles Hardy was offered without objection, and was marked "Exhibit B," and also another marked "Exhibit C." She testified that another letter was received, but she did not know where it was. She started to tell about a letter being received on the 30th of March, and what was its contents, and she stated she thought it was in the courthouse, but it was not in her possession. There was an assertion made of a note for $26.88 being sent in to the Illinois Bankers' Life Association, and counsel objected to it, but it developed that no notice was served to produce the note, but apparently before the jury statement was made by the counsel for the beneficiary as follows:

"By the Court: Did you serve notice to produce the note? Mr. Sitton: No, sir, we did not. . . Comes now the plaintiff and requests the defendant to produce the note and extension agreement executed about the 1st or 2nd day of April, 1925, which was forwarded by mail to the Illinois-Bankers' Life Co. By Mr. Sandlin: What date? By Mr. Sitton: 1st or 2nd of April, 1925. By Mr. Sandlin: Comes now the defendant and decline to produce such note under the statute for the reason that no notice has been served on the defendant and there is no such note or extension agreement in existence, and the statutory notice has not been served on the defendant and it has no notice of such claim, and further object because it is not within the issues of this case. By the Court: Under the statement there is no such note, I will let her answer. She may testify to the note if there was one. By Mr. Sandlin: Exceptions. Q. Was there a second note in the sum of $26.88, executed and sent to the Illinois-Bankers' Life Company? A. Yes, sir. You know who signed that note? A. Yes, sir. Q. Who? A. Charley Hardy and Paul Hardy. Q. Know

when it was due? A. Due the 1st day of October, 1926. Q. That was mailed to the Illinois-Bankers' Life Company? By Mr. Sandlin: We object to that as irrelevant, incompetent and immaterial and leading. By the Court: Sustained. By Mr. Sitton: Exceptions. Q. Did Charley Hardy ever receive acknowledgment of that note? A. Yes, sir, he did. Q. Did you see that acknowledgment? A. Yes, sir, I did. Q. What kind of paper was it written on? By Mr. Sandlin: Defendant objects to the question asked the witness for the reason same is irrelevant, incompetent, and immaterial, and without the issue in the case and a surprise to the defendant and not within the issues. By the Court: Overruled. By Mr. Sandlin: Exceptions. Q. I asked her what color of paper it came on. A. It was yellow. By Mr. Sandlin: We move to strike all the testimony of this witness with reference to the note and extension agreement, it is not the best evidence, hearsay and irrelevant, incompetent and immaterial and not within the issues. By the Court: Overruled. By Mr. Sandlin: Exceptions. By the Court: I am going to sustain that objection; it is well taken, you haven't shown where this letter is. Q. Are you in possession of the receipt sent by the defendant to Charley Hardy for the $26.88 note? By Mr. Sandlin: We object to that as assuming a state of facts not proven, leading, suggesting, and irrelevant, incompetent, and immaterial. A. No, sir. By the Court: Overruled. By Mr. Sandlin: Exceptions. Q. You know where it is? A. No, sir, I don't. Q. Have you diligent search for it? A. Yes, sir. Q. Tell the court what search you made for it and for the other correspondence. A. Went through practically everything on the place looking for it; through all the trunks and every place we could have put it. Q. You know why and how it was lost? A. Well, I don't. Q. This other correspondence, find any of that? A. No, sir, only found two letters. Q. That is all you could find? A. Yes, sir."

Counsel then proceeded to take the letters attached to a deposition on file, to establish the signature of the insured, and finally introduced the whole deposition. At page 28, the following occurred:

"Q. At the time that Charles E. Hardy sent the note signed by him and Paul Hardy for this $26.88, due October 1st, did you send the policy back with it at that time? By Mr. Sandlin: We object to that as assuming facts not proven, irrelevant, incompetent, and immaterial, and not the best evidence. By the Court: Overruled. By Mr. Sandlin: Exceptions. A. No, he didn't. Q. Why didn't he? A. His mother was in Texas and had the policy with her. Q. Was there anything said in the letter that you received from them in accepting the premium about the policy? By Mr. Sandlin:

We object to that as irrelevant, incompetent, and immaterial, and not the best evidence, no demand having been made on the defendant. By the Court: Overruled. By Mr. Sandlin: Exceptions. A. He wrote them when he sent the note his mother was in Texas with the policy and when she came back he would send the policy, and he got an answer from them that they accepted the note, and he was to send the policy and have it changed and during this time Charley got killed. By Mr. Sandlin: Comes now the defendant and moves to strike the question and answer as being irrelevant, incompetent, and immaterial, and ask the court to now instruct the jury to disregard the question and answer made by the witness. By the Court: In regard to the letters, you made proof in regard to them. By Mr. Sitton: Yes, sir. By the Court: Overruled. By Mr. Sandlin: Exceptions. By Mr. Sitton: That's all."

Request was made to strike this testimony as not being covered by the pleadings and being a matter of surprise, but it was overruled. On cross-examination she said that recently, after the death of the deceased, she looked at the letter in the spring of 1926, and that her husband talked to the lawyer about the suit, but she did not until afterwards. That she did not tell the lawyer at first about the policy being down in Texas, but she delivered the letters immediately after the death of the insured. She read the note, but did not remember what it said. That they sent him the note to sign, and found out what work he was in, and did not accept the note with double indemnity, and sent it back with one for $26.88, and that the insured signed it and Paul signed it and sent it back and got a letter showing that they accepted it. That she saw the letter when it came, and at page 32 of the case-made the following took place:

"A. Charley Hardy wasn't there at home; he came in that night. Q. What did his wife do with this note and letter? A. Probably laid it down and put it in the trunk; anyway she put it away somewhere, misplaced or destroyed it and never able to find it any more. Q. I thought you said you sent it back to the company? A. Sent a new note back to the company and got a letter and receipt from the company showing they had received the note."

The examination was upon these lines, and she claimed on page 34 that she did not see the paper mailed that her husband had signed, but that the date was the 1st of April and it was in the post office at Duncan; that if any extension of agreement was signed, she did not remember it, and she did

not sign as a witness. She did not remember whether or not they went before a notary. At page 35, she says:

"Q. In your best judgment did they acknowledge it or not? A. I couldn't say. All I do remember is that my husband signed the note with him."

At page 36, she says:

"A. That (the receipt) came back about the 4th or 5th of April. Q. Just the receipt? A. Receipt and a letter. Q. Thanking him? A. Thanking him for the note."

And that Charley left and went to Wewoka and his wife went to Texas. In referring to the receipt and the correspondence, she says, referring to the insured:

"A. He wrote and told them he received this receipt and thanked them and would take care of it before it was due; he had got to work and would be able to take care of the note before it came due."

She said that Paul Hardy signed the note, and that he would pay it if the insured did not.

On redirect examination the suggestion was made by way of a question as to whether he signed it under Charley's name, and she said that she only knew he signed it as a witness. She stated that her husband offered to pay the note a couple of days after Charley's death, and the company would not accept it. The note was due the first of October, 1926. Being asked about where the signature was, she said she believed it was in the left-hand corner; might be in the right-hand corner. She saw Charley sign it, but did not see where he signed it, and it was a six months' note.

The depositions of the officers of the insurance company that had been taken on its behalf were read by the plaintiff, and the plaintiff then rested and so did the defendant, and the case went to the jury on the testimony of Mrs. Hardy and the testimony of the officials and their records, resulting in a verdict for $2,000 in favor of the plaintiff, the present defendant in error. It is clear from the testimony of Mrs. Hardy that, if there was a note that had been sent back, it was the duty of the attorneys very early in the proceedings to notify the defendants to produce the note, under the statute, if they expected to introduce evidence as to its contents. Nowhere in the pleadings is there an intimation that the premium that was necessary for the continuation of the policy was paid, much less a note for something like $7 less than the policy called for was sent to the company to cover a reinstatement.

It is clear that the petition in this case was based upon the original policy calling for a premium of $34.20. If the attorneys in the case, and familiar with it, knew of the reinstatement being made by note for less than the face of it, it seems to us they had a duty to perform by the court, and their client, and the defendant, to state that in their petition. When the defendant came in with an answer and affirmed that the premium was paid for only one year, continuing the policy to December 15, 1925, and denying that any payments of any kind were made on its extension, and for that reason setting up the fact that the policy was no longer in force, it seems to us that the attorneys in the case, with the knowledge of the probable testimony of Mrs. Hardy, had a duty to perform by intimating somewhere in the pleadings that they relied upon a modification of said policy, and a payment of the reduced premium, and a payment by note accepted. The attorneys, in their examination of the witness, assumed that the note had been sent in, and by a process of suggestive treatment the witness testified to it, a matter that should have been disclosed in the pleadings under all rules of fair play.

When one examines the testimony of the officers of the company with their records, which were put in evidence by the plaintiff below, it is clear that the policy was never renewed. By reference to its provisions, we find that the face of the policy declared on is as follows:

"The Illinois Bankers Life Association, Monmouth, Ill., hereby insures the insured Charley Edwin Hardy (herein called the insured) of Duncan, state of Oklahoma, and agrees to pay the beneficiary Mattie May Hardy, mother of the insured, as beneficiary, subject to the provisions and exceptions hereinafter contained, the sum of the principal sum, two thousand dollars (less any benefits paid to the insured under the provisions for 'Old Age Disability Benefits' on page 2 hereof) in accordance with the terms of the opinion selected by the insured, upon receipt of due proofs of the death of the insured while this policy is in full force; or, in lieu thereof, and on the conditions stated in, the section entitled 'Double Benefit for Accidental Death' on page 2 hereof, agree to pay four thousand dollars (double indemnity) (which is double the face of this policy) to the same beneficiary in the same manner as herein described; or, in lieu of the foregoing, and on the conditions stated in the section entitled 'Total and Permanent Disability Benefits' on page 2 hereof, (disability benefits) agree to pay for the insured the premiums hereon, and to the insured, beginning six months after receipt of due proofs of the total and permanent disability of the insured, prior to attaining the age of 65 years, as defined on page 2 hereof, a life income of twenty dollars per month, and in addition thereto agrees to pay two thousand dollars (which is the face of this policy) (old age benefits) to the insured in installments as provided in said section, beginning six months after the receipt of due proof of the total and permanent disability of the insured after attaining the age of 65 years.

"This insurance is granted in consideration of the application of the insured for this policy, which is made a part of this contract, and the payment in advance of thirty-four and 20/100 dollars, as a first payment, receipt whereof is hereby acknowledged, which pays for the period ending December 15, 1925, with grace as herein provided, and the payment of all subsequent premiums required under this contract at or before the time when due and payable during the continuance of this contract. The conditions, provisions, and benefits printed or written on the following pages hereof are a part of this contract as fully as if recited over the signatures hereto affixed.

"In witness whereof, the Illinois Bankers Life Association has caused this contract to be executed at its home office in the city of Monmouth. Ill., this 15th day of December, 1924.

"W. H. Woods, President.
"Robt. M. Work, Secretary."

Under the head of "Provisions and Benefits," we find the subject of premiums as follows:

"Premiums. All premiums are due and payable at the home office or at such depository bank as may be designated in the premium notice by the directors. Any unpaid premiums of the then current policy year shall be deducted from the amount payable under this policy in event of the death of the insured."

The subjects continue as follows:

"Notice of Premiums. The officers shall give notice of any premium due by mailing the same to the last-known post-office address of the policyholder as shown by the records in the home office. Affidavit of mailing of said notice by the one in charge thereof shall constitute and be deemed and held to be conclusive proof of notice to the insured of said premium being due."

"Payment of Premiums. This policy may be renewed after the first policy year by the payment of an annual premium of thirty-four dollars and 20/100, and is based upon premiums being paid annually in advance, but premiums may be made payable in semi-annual or quarterly installments on written request of the insured to the home office which will thereupon furnish the dates therefor. Such payments shall not continue

the policy in force beyond the period covered by the payment actually made. Failure to pay any premium when due or within the period of grace allowed herein shall render the policy absolutely null and void and the same shall be forfeited without further notice or action by the board of directors."

"Grace. On all renewal premiums 30 days' of grace will be allowed during which premiums may be paid and during which time this policy shall remain in force."

"Reinstatement. This policy after default in payment of any premium may be reinstated upon the insured furnishing to the home office satisfactory and acceptable evidence of insurability and paying all past due premiums with compound interest thereon at the rate of six per cent. per annum."

The double indemnity clause is as follows:

"Double Benefit for Accidental Death. The double indemnity benefit provided for on the first page hereof shall be payable to the same beneficiary at the same time and under the same conditions as described herein, in the event of the death of the insured being caused exclusively and independently of all other causes by bodily injuries effected directly by external, violent and accidental means (murder and suicide, or attempt at suicide, while sane or insane, excepted), provided said death occurs within 90 days after said injuries are received. This provision shall become null and void if the accident occurs while the insured is in default in the payment of any premium or installment thereof, and in any event when the insured attains the age of 60 years; or if the insured is engaged in military or naval service in time of war, or is participating in an aeronautic or submarine expedition. This provision for double benefit for accidental death shall not apply unless the body shows a contusion or wound on the exterior thereof as a result of such accident (except in case of drowning or internal injuries revealed by autopsy)."

The entire correspondence on the subject is attached to the depositions as testified to by the witnesses that were made use of by the plaintiff. It is clear from that that the policy was never sent in for modification, notwithstanding the company apparently was very anxious to continue the insurance. The company objected to carrying the insurance of double indemnity on a change of occupation from that of farming to that of common laborer, but not specifying what it was, and the correspondence was explicit on the subject, and the letter on the 19th of March calls for immediate attention as follows:

"May we not suggest that you give this matter your immediate attention by forwarding these items by return mail, in order that reinstatement may be completed that you may enjoy the protection provided under your policy."

The insurance company, according to these depositions, had prior to this time received an application for reinstatement, but were not willing to reinstate and provide for the double indemnity with his change of occupation. In the reinstatement application, exhibit 5, is found the following:

"It is agreed that the said policy shall not be restored until this application shall be approved by the medical director of the company, and that if any of the statements or answers to the questions herein warranted shall prove to be incomplete or untrue, then the reinstatement of said policy, if granted upon this application, shall be void and of no effect, notwithstanding the incontestable provisions contained therein, the benefit of which in such cases is hereby waived, and said policy shall not be continued in force by virtue of such reinstatement or the payment of any premium or premiums thereunder subsequent to the date of said default.

"My correct address is Charlie E. Hardy, Duncan, Okla. 320 8th street. Date 2/21/1926.

"Red) 320 S. 8th St.
"Witness to signature of applicant
"P. E. Hardy
"_____, Applicant."

On the 4th of March, a letter was received saying that he had been a farmer, but was now at work in the oil fields. On the 9th of March, he was notified that the medical department had seen fit to approve the application for reinstatement of the policy, without the double indemnity and special disability features, and there was sent a new agreement for execution and return in the sum of $26.88, covering the annual premium on the policy. On the 19th of March, 1926, there is evidently an answer to this letter in which he insisted upon the present form of policy being the one he wanted. The letter is as follows:

"Monmouth, Ill.
"March 17, 1926.

"Dear Sir:

"I am answering your received of March 9 in regard to my I sent them accordin to your agreatment and now you are wanting to change my policy and me to sine another note but if I can get it I can meet the one that sined you wrote me and wanted me to do what I did an sent me my note and I dont expect to be this way all wayes and the policy I am carrying is the one I want and I know I hit a hard place but ame to take this note up before long long before it come due I will close I have got the note

you sent back to me you can answer and let me know whether I want the one that had. Answer soon.

"Charley E. Hardy."

On the 19th of March, a letter was written by the company telling him it was necessary to forward the policy for indorsements, covering the double indemnity and special disability features, along with the premium extension agreement in the sum of $26.88, bearing his signature. The latter part of that letter is the quotation above given. No reply was received to this, and on March 31, 1926, which appears to be the last of the correspondence, the company sent the following letter:

"March 31, 1926.
"In Re-No. 156,469

"Mr. Charley Hardy
"320 S. 8th St.
"Duncan, Oklahoma.

"Dear Sir:

"We wrote you under date of March 19th, stating that your application for reinstatement had been approved after eliminating the double indemnity and special disability features.

"If you will forward the new premium extension agreement in the sum of $26.88, covering the annual cost of your policy after eliminating the special disability and double indemnity features, together with your policy, we will be very glad to make this reinstatement for you.

"Very truly yours,

"Illinois Bankers Life Association,
"By Auditor."

Those letters were introduced in the deposition taken by the company on the 6th day of December, 1928.

In the trial of the case the only testimony to establish the fact of the policy being reinstated was the testimony of Mrs. Hardy. Throughout that testimony it is painfully apparent that what had been suggested by the form of the question in large measure influenced the answer. She claimed that she saw a receipt, or rather a letter, acknowledging the receipt of what she thought was the note, but her testimony on the whole, on that point, was so thoroughly weak that it is highly probable that she scarcely knew what her testimony was. Evidently recognizing that fact, and in order to supplement it, the plaintiff below saw fit to introduce the depositions taken by the defendant below, the present plaintiff in error, showing the state of its records and the correspondence had between the parties. That record on its face appears to be natural, and it appears therefrom that the conditions were not met, re-

quired by the company for the reinstatement of this policy. Without it being reinstated, of course, there could be no recovery under the contract between the parties. It is very evident that a modification of the contract was sought by the company if the insured was to be carried further. The insured, evidently from the correspondence, insisted upon their carrying him as they had before, though he had changed his occupation and was engaged in a hazardous occupation, at which he shortly was killed.

It seems to us that the plaintiff was thoroughly on inquiry and thoroughly appreciated, at least her attorneys did, the necessity for proving the reinstatement of the policy. They failed to do so by the testimony of their only witness. They sought to supplement that testimony by the depositions of the officials of the defendant below, showing their records. By so doing, they affirmed the credibility of the witnesses deposing, so that when the plaintiff closed her case the positive testimony from the record contradicted entirely the reinstatement of the policy.

The testimony of the witness that she relied upon was scarcely reliable, either in accuracy or in a showing of knowledge. She did speak finally of having seen a letter from the company acknowledging receipt of a note for a lesser amount than that called for in the policy declared on. No doubt there was not sufficient proof of the loss of the document or its existence to warrant secondary proof of its contents. Any of the cases cited in either brief practically so demonstrate. Adams v. King, 68 Okla. 190, 170 P. 912, as well as the same case on rehearing, 68 Okla. 193, 173 P. 206, most clearly demonstrates that the proof in this case of the existence of the letter and of its being forwarded and of its contents falls short of meeting the requirement as to secondary evidence.

The case of Farmers Nat. Bank v. Hartoon, 60 Okla. 193, 159 P. 844, is cited to the same effect. It has some of the aspects of the procedure that this case has. It is clear there that the introduction was regarded as highly prejudicial, and it is more so in this case. The case of National Surety Co. v. Oklahoma Nat. Life Ins. Co., 74 Okla. 27, 165 P. 161, is to the same effect, and in that case another aspect of this case is covered by legal declaration, " 'A party cannot impeach his own witness, and this doctrine is an ancient rule of the common law.' Jones on Evidence, vol. 5, sec. 853." When a person introduces a witness and knows what he will swear to, as in this case, with refer-

ence to the depositions, he thereby affirms that the witness is credible. See Greenleaf on Evidence (2nd Ed.) sec. 442, and Jones on Evidence, sec. 2345.

By examining the record in this case, we cannot say that we believe that the verdict is warranted by the evidence, or that the court followed the law in allowing the secondary evidence to be made in the manner that it was made in the proof of the contents of a document the existence of which was denied by the defendant and the existence of which was not affirmed in the pleadings of the plaintiff, which declared upon an entirely different contract. Perhaps on another trial the plaintiff may be able to make more substantial proof of the fact that the policy was reinstated, but at the present time the proof would not warrant the verdict.

The cause is reversed, with directions to grant a new trial.

LESTER, C. J., CLARK, V. C. J., and RILEY, CULLISON, SWINDALL, and ANDREWS, JJ., concur. HEFNER and McNEILL, JJ., absent.